IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-00013

JERED MORGAN,

    Plaintiff,

v.

TOWN OF KERSEY, COLORADO,
KAYLEE DAMRELL, in her official and individual capacities,

    Defendants.

## COMPLAINT

Plaintiff Jered Morgan, by and through his attorneys Andy McNulty, Mari Newman, and Madeline Leibin of NEWMAN | MCNULTY, hereby submits his Complaint, and states as follows:

### INTRODUCTION

1. In 2026, social media platforms, like Facebook, provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Facebook allows any person with an internet connection to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997). Plaintiff Jered Morgan became a town crier in Defendant Town of Kersey, Colorado ("Kersey") by using Facebook to publish information that demonstrated corruption and malfeasance by Kersey's Chief of Police, Jonathan Lange.

2. Kersey was thrust into the statewide spotlight in November of 2025 when 9News journalists exposed Kersey's blatantly illegal scheme to use radar equipment to issue speeding

1

tickets that were hundreds of dollars more expensive than allowed under state law. Despite the subsequent public outrage, Kersey continued in its blatantly illegal conduct by violating Colorado's Open Meetings Law.

3. In the wake of these scandals, Plaintiff Jered Morgan discovered that the Kersey Chief of Police, Jonathan Lange, and his wife, Sherri Lange, were involved in a covert online propaganda campaign by using fake names to try to convince Facebook users that Kersey was not violating the law. Morgan also uncovered that Chief Lange, and his wife, had been caught on camera engaging in sexist and homophobic remarks. Morgan sought to expose the actions of Chief Lange and his wife online.

4. Morgan did so by commenting on Kersey's Facebook page and connecting the dots for those who viewed the page. In those posts, he was also clearly critical of Kersey and Chief Lange.

5. In response, Kersey, through its Community Engagement Specialist Kaylee Damrell, deleted Morgan's comments and blocked him. These actions violated Morgan's clearly established First Amendment rights.

6. To make matters worse, Damrell took these actions in accordance with Kersey's facially unconstitutional social media policy, which allowed her to delete all comments that she deemed crude, inappropriate, misleading, or hostile, and block any Facebook users who repeatedly posted comments she deemed crude, inappropriate, misleading, or hostile. This policy, which required Damrell to block users and delete comments on the basis of their content and viewpoint, clearly violates the First Amendment.

7. Morgan brings this lawsuit to vindicate his constitutional rights, and to ensure that Kersey cannot continue to flagrantly violate the law without consequence.

## JURISDICTION AND VENUE

8. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

9. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

10. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

11. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b), because all of the events alleged herein occurred within the State of Colorado.

## PARTIES

12. At all times relevant to this complaint, Plaintiff Jered Morgan was a citizen of the United States of America and a resident of the State of Colorado.

13. Defendant Kersey is a municipality and as such is a proper Defendant under 42 U.S.C. § 1983.

14. At all times relevant to this Complaint, Defendant Kaylee Damrell was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Damrell was acting within the scope of her official duties and employment and under color of state law in her capacity as the Community Engagement Specialist for Kersey.

## FACTUAL ALLEGATIONS

**Facebook is a public forum in which political speech is disseminated and debated.**

15. Facebook is a social media platform with more than two billion monthly active users. In the United States, approximately two-thirds of adults are Facebook users. Facebook allows its users to publish messages of any length (or publish Facebook "posts"), to republish other users' posts, and to respond to (or "comment on") other users' posts. Speech on Facebook ranges

3

from birthday wishes to heartfelt reconnections to political discourse. Particularly relevant to this lawsuit is the amount of speech by, to, and about the government at all levels that occurs on Facebook on a daily basis.

16. Facebook users are those with an account that has been created on the platform. A Facebook user's "profile" includes the user's name, a description of themselves, biographical information, work history, and other web pages maintained by the user. A Facebook "profile" is a personal account on Facebook.

17. In contrast, a Facebook "page" is a user account created by a public figure. Many public officials create Facebook user "pages" that represent their official capacity as a government or public official. These pages are called "Community or Public Figure" pages and differ from personal Facebook user profiles in appearance and content. Facebook users who maintain "pages" often describe their official political positions on their page.

18. By default, Facebook profiles and pages are visible to everyone with internet access. Although non-users can view users' Facebook profiles and pages, they cannot interact with them on the Facebook platform without creating an account.

19. A Facebook user's webpage displays all posts generated by the user, with the most recent posts appearing at the top of the page. This display is known as a user's "timeline." When a user posts on Facebook, the user's timeline immediately updates to include that post. Anyone who can view a user's public Facebook page can see the user's timeline.

20. A user can post on their own timeline, or on another user's timeline. Facebook posts can include photographs, videos, and links. Users can post links to news articles.

21. While Facebook profiles can be "protected" by users, which results in limits on who can see the user's timeline and who can search for their posts, Facebook pages cannot be limited in this way. Facebook pages are inherently open to the public.

22. By default, any Facebook user can comment on any other user's posts or timeline. Any Facebook user can also reply to another user's comment on a third user's post. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." Facebook's comment threads are a large part of why it is a social media platform. Comment threads reflect multiple overlapping conversations among and across a group of users.

23. Users and creators of Facebook's pages, however, can "block" individuals. When a user with a Facebook page "blocks" an individual, that individual can no longer view or comment on the user's Facebook page. They can also no longer view other individuals' comments on the user's Facebook page. Put differently, Facebook users are able to post and comment on Facebook public figure pages freely, unless they are "blocked."

24. Users and creators of Facebook's pages also have the ability to delete other users' comments on their posts.

**The Kersey Facebook page is a public forum in which political speech is disseminated and debated.**

25. Kersey maintains an official Facebook page, which can be found at: https://www.facebook.com/townofkersey/ ("the Kersey Facebook page").

26. The Kersey Facebook page is generally accessible to the public at large without regard to political affiliation or any other limiting criteria. Any member of the public can view its posts other than those who are affirmatively banned from the Kersey Facebook page. Any Facebook user who wants to follow the Kersey Facebook page can do so. Any Facebook user can also comment on The Kersey Facebook page's posts, unless they have been blocked.

5

27. The Kersey Facebook page has over 3,500 followers.

28. Kersey uses the page to promote official government business and to directly communicate with Coloradans. Kersey posts important government information on its Facebook page on a daily basis.

29. The Kersey Facebook page functions as a digital town hall in which Kersey communicates official news and information to the public, and members of the public can comment on that news and information to both respond to Kersey and to exchange political views with other members of the public.

30. The Kersey Facebook page is an important place for discussion and debate about Kersey government policy and decision-making. The comment threads associated with the posts on the Kersey Facebook page are important forums for communication relating to important information about government policy and decision-making.

31. The Kersey Facebook page is controlled completely by its officials. In particular, Damrell manages Kersey's Facebook page as part of her official duties as Community Engagement Specialist. In that role, Damrell makes decisions on what to post on the Kersey Facebook page, who to block from viewing the Kersey Facebook page, and what comments to delete from the Kersey Facebook page.

**Damrell blocked Morgan from the Kersey Facebook page and removed his comments because of his criticism of Kersey and Chief Lange.**

32. Morgan is a citizen of Colorado who is concerned about government misconduct.

33. Morgan learned through news coverage that Kersey, a notorious speed-trap town in Weld County, launched a predatory photo radar system to drive revenue to the Kersey Police Department. The photo radar system was operating in violation of state law and Kersey's own ordinances by charging speeding drivers $340 per violation instead of the $40 maximum

6

authorized by law. This decision to gouge Coloradans received significant media coverage and criticism from Coloradans across the state.

34. Instead of ceasing its clearly unlawful actions, Kersey amended its ordinance capping the amount that could be charged for a speeding ticket at $40 and added in a loophole stating that the cap does not apply to citations for exceeding the posted speed limit by twenty-five miles per hour. The amended ordinance as passed did not specify a punishment for violations that exceeded twenty-five miles per hour over the posted speed limit, leaving more questions than clarity.

35. Kersey amended its ordinance at a special session of its Town Council meeting without listing the item on its agenda in violation of Colorado's Open Meeting laws.

36. In response to the firestorm caused by these actions, Kersey actively sought to silence its critics online. Morgan was among those critics.

37. Not only was Morgan a critic, but he had discovered information that was extremely damaging to the Kersey official responsible for the photo radar scheme, Chief of Police Jonathan Lange. Morgan discovered that Chief Lange's wife, Sherri Lange, was posting propaganda online in a local Facebook group defending Kersey's actions under a fake name (Jenny Jones). Chief Lange's wife, posting under the fake name, claimed to be an attorney, when she was not an attorney. Morgan also discovered that Chief Lange had been previously caught on camera yelling sexist and homophobic remarks at a former neighbor.

38. Morgan sought to expose Chief Lange and his wife. He posted about the remarks made by Chief Lange on the Kersey Facebook page using his common law name "Lucky225." He also posted criticism of the photo radar program in Kersey on the Kersey Facebook page. In

7

response, Kersey, through its Community Engagement Specialist Kaylee Damrell, deleted Morgan's comments and blocked him from commenting on the Kersey Facebook page.

39. Damrell was working as the Community Engagement Specialist for Kersey in November of 2025. Damrell, in her official capacity as Community Engagement Specialist for Kersey, viewed, evaluated, and deleted Morgan's comments on the Kersey Facebook page. Damrell, in her official capacity as Community Engagement Specialist for Kersey, blocked him from commenting on the Kersey Facebook page.

40. Morgan was not the only person that Damrell blocked for criticizing Kersey.

41. In addition, Chief Lange, using an account with a fake name, attempted to get Morgan blocked and his comments deleted from multiple local community Facebook groups where he had posted the same comments and criticism that he posted to the Kersey Facebook page.

42. After Kersey blocked Morgan, it issued a statement on the Kersey Facebook page that it was Kersey's policy to delete comments that Kersey deemed crude, inappropriate, misleading, or hostile. It also stated that, under its policy, it would block accounts that repeatedly posted comments it deemed crude, inappropriate, misleading, or hostile.

43. This statement was clearly posted on the Kersey Facebook page in response to Damrell's blocking of multiple individuals who were critical of Kersey in comments on Kersey's Facebook page and deletion of their critical comments.

44. 9News covered the statement on the Kersey Facebook page, and spoke to Damrell about it. Damrell claimed that Kersey had only deleted comments that Kersey deemed to contain hostile or explicit language.

8

45. After Morgan read the report on 9News, he reached out to Damrell via Facebook message to ask her to correct the record about his blocking. Morgan had never used hostile or explicit language.

46. Instead of reversing Morgan's block from the Kersey Facebook page, Damrell blocked Morgan from her personal Facebook page, demonstrating that he had received Morgan's message contesting his blocking.

47. To this day, Morgan remains blocked from the Kersey Facebook page. He cannot view the contents of the page and cannot post comments on the page.

48. Morgan cannot participate the digital town hall in which Kersey communicates official news and information to the public, and cannot comment on that news and information to both respond to Kersey or to exchange political views with other members of the public.

49. Damrell did not delete comments that were supportive of Kersey or block those who were supportive of Kersey.

50. Damrell's blocking of Morgan and deletion of his comments was viewpoint-based.

51. Damrell blocked Morgan, and deleted his comments, in retaliation for Morgan's criticism.

52. Damrell's retaliatory actions were premised on Morgan's political protected criticism.

**Damrell's blocking of Morgan from the Kersey Facebook page in in accordance with Kersey's unconstitutional official policy.**

53. Darnell's blocking of critics of Kersey from the Kersey Facebook page, like Morgan, is part of an ongoing pattern and practice of Damrell and Kersey of blocking individuals who are critical of Kersey.

54. Damrell blocked Morgan from the Kersey Facebook page in accordance with Kersey's official policy governing the Kersey Facebook page. The official Kersey Facebook policy stated that Damrell should delete all comments that she deemed crude, inappropriate, misleading, or hostile. The official Kersey Facebook policy also stated that Damrell should block all individuals who repeatedly posted comments that she deemed crude, inappropriate, misleading, or hostile.

55. Damrell stated publicly that she blocked Morgan from Kersey's Facebook page and deleted his comments in accordance with these official policies.

56. The official Kersey Facebook policy facially violates the United States Constitution by enforcing a content- and viewpoint-based restriction on speech.

57. The official Kersey Facebook policy caused the violation of Morgan's constitutional rights.

**STATEMENT OF CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — First Amendment**
**Free Speech**

58. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

59. At all times relevant to this Complaint, Damrell was acting under the color of law.

60. Plaintiff was engaged in First Amendment-protected speech in his commenting on the official Kersey Facebook page.

61. Plaintiff's speech was on a matter of public concern and did not violate any law.

62. By blocking Plaintiff from the official Kersey Facebook page, and deleting his comments, Damrell prevented Plaintiff from exercising his First Amendment right to speak freely.

63. Damrell's blocking of Plaintiff from commenting on posts on the Kersey Facebook page, and the deletion of his comments, was at least a content-based, and more specifically a viewpoint-based, restriction on speech.

64. The Kersey Facebook page is a designated public forum.

65. Damrell's conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Damrell's position knew or should have known. Viewpoint-based prior restraint on speech has been widely known as being unconstitutional for more than eight decades. *See Near v. Minnesota*, 283 U.S. 697 (1931). The fact that censorship of speech by government officials on official government social media pages violates the First Amendment has been clearly established since at least March of 2024. *See Lindke v. Freed*, 601 U.S. 187 (2024).

66. Damrell blocked Plaintiff and deleted his comments in accordance with the customs, policies, and practices of Kersey.

67. Kersey has a custom, practice or policy of tolerating violations of the First Amendment of the United States.

68. The actions of the Damrell were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Kersey.

69. Kersey's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the violation of Plaintiff's constitutional rights.

70. Kersey's training, supervision, and discipline caused the violation of Plaintiff's constitutional rights

71. Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to Plaintiff's constitutional rights.

72. Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

73. Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages in that he was prevented from speaking freely on a matter of public concerns, among other injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — First Amendment**
**Right to Petition**

74. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

75. At all times relevant to this Complaint, Damrell was acting under the color of law.

76. Plaintiff was engaged in First Amendment-protected petitioning in his commenting on the official Kersey Facebook page.

77. Plaintiff's speech was on a matter of public concern and did not violate any law.

78. By banning Plaintiff from the official Kersey Facebook page, and deleting his comments, Damrell prevented Plaintiff from exercising his First Amendment right to petition.

79. Damrell's banning of Plaintiff from commenting on posts on the Kersey Facebook page, and the deletion of his comments, was at least a content-based, and more specifically a viewpoint-based, restriction on his petitioning activity.

80. The Kersey Facebook page is a designated public forum.

81. Damrell's conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Damrell's position knew or should have known. Viewpoint-based prior restraint on speech has been widely known as being unconstitutional for more than eight

decades. *See Near*, 283 U.S. at 697. The fact that censorship of speech by government officials on official government social media pages violates the First Amendment has been clearly established since at least March of 2024. *See Lindke*, 601 U.S. at 187.

82. Damrell blocked Plaintiff and deleted his comments in accordance with the customs, policies, and practices of Kersey.

83. Kersey has a custom, practice or policy of tolerating violations of the First Amendment of the United States.

84. The actions of the Damrell were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Kersey.

85. Kersey's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the violation of Plaintiff's constitutional rights.

86. Kersey's training, supervision, and discipline caused the violation of Plaintiff's constitutional rights

87. Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to Plaintiff's constitutional rights.

88. Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

89. Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages in that he was prevented from speaking freely on a matter of public concerns, among other injuries, damages, and losses.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — First Amendment**
**Retaliation**

90. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

91. At all times relevant to this Complaint, Damrell was acting under the color of law.

92. Plaintiff was engaged in First Amendment-protected speech and petitioning in his commenting on the Kersey Facebook page.

93. Plaintiff's speech and petitioning was on a matter of public concern and did not violate any law.

94. Damrell responded to Plaintiff's First Amendment-protected activity with retaliation, including but not limited to deleting his comment and banning him from commenting on the Kersey Facebook page.

95. Damrell's retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

96. By banning Plaintiff and deleting his comment, Damrell sought to punish Plaintiff for exercising his First Amendment rights, to silence his future speech, to stop him from petitioning, and to restrict his freedom of expression, along with the future speech and expression of others. Damrell's retaliatory actions would chill a person of ordinary firmness from engaging in First Amendment-protected activity.

97. Damrell's conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Damrell's position knew or should have known. Viewpoint-based prior restraint on speech has been widely known as being unconstitutional for more than eight decades. *See Near*, 283 U.S. at 697. Retaliation against an individual based on his First-Amendment-protected speech has been clearly established in the Tenth Circuit for almost two decades. *See Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). The fact that censorship of

speech by government officials on official government social media pages violates the First Amendment has been clearly established since at least March of 2024. *See Lindke*, 601 U.S. at 187.

98. Damrell blocked Plaintiff and deleted his comments in accordance with the customs, policies, and practices of Kersey.

99. Kersey has a custom, practice or policy of tolerating violations of the First Amendment of the United States.

100. The actions of the Damrell were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Kersey.

101. Kersey's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the violation of Plaintiff's constitutional rights.

102. Kersey's training, supervision, and discipline caused the violation of Plaintiff's constitutional rights

103. Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to Plaintiff's constitutional rights.

104. Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

105. Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages in that he was prevented from speaking freely on a matter of public concerns, among other injuries, damages, and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

a. Declaratory relief in the form of a declaration that Damrell violated Plaintiff's constitutional rights;

b. Injunctive relief, including:

   i. An order requiring Kersey and Damrell to unblock Plaintiff;

   ii. An order requiring Kersey to change its official Kersey Facebook policy in a way that complies with the Constitution;

   iii. An order requiring that Kersey provide training to its officials regarding the protections of state and federal law for those posting on government social media pages;

   iv. An order enjoining Damrell, or any Kersey official, from blocking Plaintiff in the future from Kersey's official social media accounts, including the Kersey Facebook page;

c. Compensatory damages as allowed by law, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

d. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. Attorney's fees and costs; and

g. Such further relief as justice requires.

Dated this 4th day of January 2026.

        NEWMAN | MCNULTY

        *s/ Andy McNulty*
        Andy McNulty
        Mari Newman
        MadelineLeibin
        1490 N. Lafayette Street Suite 304
        Denver, CO 80218
        (720) 850-5770
        andy@newman-mcnulty.com
        mari@newman-mcnlty.com
        madeline@newman-mcnulty.com

        ATTORNEYS FOR PLAINTIFF